Filed 1/27/23  In re Angela D. CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re ANGELA D. et al., Persons Coming Under the Juvenile Court Law. | B318408 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. CRISTINA M. et al., Defendants and Appellants. | (Los Angeles County Super. Ct. No. 19CCJP07061) |

APPEAL from an order of the Superior Court of Los Angeles County, Gabriela H. Shapiro, Judge Pro Tempore. Affirmed.

Maureen L. Keaney, under appointment by the Court of Appeal, for Defendant and Appellant Cristina M.

Jacques Alexander Love, under appointment by the Court of Appeal, for Defendant and Appellant Nicholas D.

Dawn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and William D. Thetford, Deputy County Counsel, for Plaintiff and Respondent.

_____

## INTRODUCTION

Cristina M. (Mother) and Nicholas D. (Father) appeal from the juvenile court's order terminating their parental rights to their three children. The parents argue the court erred when it concluded the beneficial parent–child relationship exception to adoption did not apply. We affirm.

## BACKGROUND

The family in this case consists of Father, Mother, Angelina D. (born 2013), Rafael D. (born 2015), and Christopher D. (born 2018).

## 1. Detention

The family came to the attention of the Orange County Social Services Agency (the Agency) when it received report of a car crash.

On September 17, 2019, Father was driving the family car with Mother in the front passenger seat and the children—five-year-old Angelina, four-year-old Rafael, and 11-month-old Christopher—in the back seat. Mother and Father admitted they were arguing while Father was driving. Father hit a curb, lost control of the car, and hit another vehicle head-on at 40–45 miles per hour. Father was arrested for felony driving under the influence with a blood-alcohol content over 0.08. It was unclear if the children were properly restrained in the vehicle.

2

The children were transported to Children's Hospital Orange County for medical treatment. Angelina sustained a non-displaced right elbow fracture and superficial bruising to her left cheek and left eyebrow. Rafael sustained a small hematoma at the nasal bridge and a non-displaced nasal bridge ecchymosis. Christopher displayed no acute stress from the accident, and his skeletal survey came back negative.

On September 23, 2019, the Orange County Juvenile Court issued a warrant allowing the Agency to remove the children from the parents' custody.

## 2. Jurisdiction

On September 25, 2019, the Agency filed a petition under Welfare and Institutions Code section 300, subdivisions (a), (b)(1), (g), and (j).[1] The petition alleged Father drove Mother and their three children while under the influence of alcohol, which caused Father to lose control of the car and collide head-on with another car (counts a-1, b-1). Contributing to the crash was domestic violence between the parents while Father was driving (counts a-2, b-2). Two of the three children sustained injuries (counts a-3, b-3). Father was arrested for driving under the influence of alcohol and for child endangerment. The petition also alleged Father and Mother exposed the children to domestic violence and substance abuse in the family home (counts a-4, b-4); the parents had unresolved substance abuse problems (counts b-1, b-5, b-7); Mother had mental health issues (count b-6); Father had anger management issues (count b-8); Father

---

[1] All undesignated statutory references are to the Welfare and Institutions Code.

had a criminal history and was currently incarcerated due to the crash (counts b-9, b-10, g-1); and the parents had a prior dependency case when Angelina was detained in November 2013, due to the parents' substance abuse (count j-1). That case had been terminated in February 2015, with the parents awarded joint legal custody, Mother awarded physical custody, and Father awarded monitored visits with Angelina.

On September 26, 2019, the Orange County Juvenile Court detained all three children from the parents. The court found Father was the presumed father. The court ordered a minimum of six hours of monitored visits per week for Mother immediately and for Father when he was released from custody. In the meantime, Father was to receive two weekly monitored phone visits. The children were placed with a maternal uncle and his wife.

At the October 21, 2019 jurisdiction hearing, the court dismissed count b-8, which alleged that Father had unresolved anger management issues, and sustained the rest of the petition under section 300, subdivisions (a), (b)(1), (g), and (j). The court continued the disposition hearing and transferred the case to Los Angeles County.

### 3. Disposition

The Los Angeles County Juvenile Court accepted the transfer on November 4, 2019, and held the disposition hearing on February 20, 2020. The children were declared dependents of the court under section 300 and removed from the parents' custody.

The court ordered reunification services for the parents. Mother was ordered to complete a full drug and alcohol program with aftercare and weekly random or on-demand testing, a

4

parenting program, and individual counseling.  Father was ordered to participate in a full drug and alcohol program with aftercare and weekly random or on-demand testing, a parenting course, a 52-week domestic violence program for perpetrators, and individual counseling.  The court awarded each parent six hours per week of monitored visitation: three two-hour visits per week.

### 4.    Reunification Period

The six-month review hearing, initially scheduled for May 13, 2020, was continued to September 29, 2020, due to COVID-19 restrictions.  At the subsequent six-month review hearing, the court ordered further reunification services.

At the contested 18-month review hearing on July 29, 2021, the court found the Department of Children and Family Services (Department) had provided reasonable family reunification services, but the parents had not made substantial progress with the court-ordered case plan.  The court terminated the parents' reunification services and set a section 366.36 hearing for December 2, 2021.  There was no change in visitation.  Mother and Father were advised of their writ rights.[2]

### 5.    Section 388 Petitions

On December 1, 2021, Father filed three section 388 petitions that asked the juvenile court for six additional months

---

[2]      Mother and Father filed a Notice of Intent to File Writ Petition on July 30, 2021.  On December 28, 2021, after no writ petition was filed, we concluded the proceeding as a non-operative writ. (*N.D. v. Superior Court* (Dec. 28, 2021, B314124) [nonpub. order].)

of family reunification services. Father's petition stated—and the attached exhibits substantiated—that Father was actively involved in a substance abuse treatment program that he started on May 8, 2021; he had attended 21 sessions of a 52-week domestic violence program; he had attended seven sessions of individual counseling; he completed a parenting program; and he currently had ten consecutive negative drug tests. Father believed reinstating reunification services was in the best interests of his children because it would strengthen the bond they had with him.

On January 25, 2022, Mother filed section 388 petitions that also sought continued family reunification services. Attached to Mother's petitions were exhibits indicating she had completed outpatient substance abuse programs and had been compliant with her psychotropic medication.

Meanwhile, the Department filed an interim review report. The report explained that a social worker had asked Angelina who she wanted to live with, and the child said she didn't know—but during one of the monthly visits, she had told a social worker she wanted to remain with her aunt and uncle. When Rafael was asked who he wanted to live with, he said, "my aunt and uncle, friends and family."

The maternal grandmother told the social worker that Mother had had problems with alcohol since her 20s, but the grandmother did not know if Mother still was drinking because Mother refused to speak with her. Likewise, the maternal grandfather said Mother had been living with him since September 2019, but they were estranged and did not communicate. He explained that Mother lived with him because the rest of the family wanted nothing to do with her.

The maternal grandmother reported that the children were being well taken care of and were happy. Angelina had told her grandmother that she did not want to return to Mother. Father and Mother both testified.

After Father's testimony, the children's attorney joined with the Department's request that the court deny the parents' section 388 petitions. Minors' counsel argued that there was no evidence supporting the parents' claims that they were sober; Mother had provided no evidence of clean drug tests since July 2021, and Father had a recent positive test and had three missed tests. Furthermore, Father had not completed his case plan. Regarding the best-interest prong, the children's attorney noted that the children had been placed with their caretakers for three years, and it was the children's desire to remain there.

The court agreed with the parents that they had made progress since family reunification services were terminated, but concluded they failed to prove more than changing circumstances and that providing them six more months of family reunification services would be in the children's best interests. Accordingly, the court held there were no changed circumstances, and it would not be in the children's best interests to provide the parents with additional reunification services. The petitions were denied.

**6.    Section 366.26 Hearing**

Following the denial of the parents' section 388 petitions, the juvenile court trailed the section 366.26 hearing to the following day. On February 4, 2022, the juvenile court accepted into evidence the parties' exhibits and indicated it would also consider the evidence, testimony, and arguments presented during the section 388 hearing.

The children's attorney joined the Department's request to terminate parental rights. Minors' counsel argued the children were adoptable, the caretakers were willing to adopt them, and there was no applicable exception to termination. In anticipation of the parents' arguments, the children's attorney addressed the beneficial parent–child relationship exception provided by section 366.26, subdivision (c)(1)(B)(i). Counsel argued that although the parents' visitation had become more regular recently, they had not visited consistently throughout the case—and, in any event, 90 minutes of visitation each week did not allow for the formation or continuation of the type of bond necessary to prevent termination of parental rights. When the court asked whether the caretakers would be willing to enter into a post-adoption contract, the children's attorney replied that the caretakers were willing to let the children have contact with the parents if they remained sober but were not currently interested in continued parental visits.

Mother's attorney asked the juvenile court to apply the beneficial parent–child relationship exception. Counsel argued that Mother had satisfied all requirements for the exception to apply, and the children wanted and expected to be returned to Mother's custody. Father's attorney stated, "Father is objecting to termination of his rights today."

The court analyzed each prong of the exception in turn. Starting with the regular visitation and contact element, the court stated: "The parents [must] show regular visitation and evidence that they've maintain[ed] minimum visitation is not sufficient. I need to show that they maintain that contact. The parents have had contact. Parents and counsel have indicated that the parents have visited as much as they can. That

8

visitation has remained monitored throughout dependency of this case." The court found: "At this time the visitation with the children has been monitored. It is not as frequent as one would like or need in order to determine that there's an emotional bond."

As to the second prong of the exception, the court stated: "With respect to prong two, I have to consider whether there's a substantial emotional attachment to the parents which implies that the children would benefit [from] continuing that relationship with the parents. [*In re Autumn H.* (1994)] 27 Cal.App.4th 567 stands for the proposition when parents and children have interactions, it will always confer some kind of incidental benefit to the child."

The court next noted that whether the parents occupied a "parental role" in the children's lives was not a factor it could consider. Rather, the parents were required to demonstrate "their contact isn't merely loving or more than friendly. They have to demonstrate that if they are not involved in their children's lives anymore it would be detrimental to the children."

The court held that there was no evidence that demonstrated the children felt or expressed an emotional and loving bond, and the parents' representations as to what would promote the children's best interest were not credible.

Moving to the third prong of the exception, the court stated: "The third prong is whether terminating the attachment would be detrimental when balanced against the benefits of an adoptive home. This is somewhat of a delicate balancing act that the court has to do. I have to look at whether there's a beneficial relationship. I need to determine how important this relationship is with the children. In terms of the ages of the

9

children, which I've referenced, the children are eight, six, and three, I believe. The children have been out of the parents' care and for a significant period of time. They have thrived [with] the caretakers since being removed from the parents' custody. They first came to the Department in 2019. Was a really serious incident that resulted with them coming into the system. Since 2019, the children have resided with these caretakers. The exception only applies where I can find this emotional attachment was there. I wasn't able to find in yesterday's 388 hearing was [*sic*] a best interest prong. And that finding from yesterday's denial, I believe it's a significant basis for the court to use as an anchor for the analysis for whether or not I can terminate parental rights today. For a much lower burden the court did not find a best interest element, I can then use that and argue that the relationship and the well[-]being of the child is out weighted [*sic*] and they would gain more in a permanent home with new adoptive parents than they would be negatively impacted by not having a continued relationship with their parents."[3]

The court also noted the children were placed together, and stated: "They appear to be thriving and doing well. They are no longer in fear of instability and they are in a loving home, and I believe that with the evidence before me, the shared experiences the children have and the relationship that [they] currently have

---

[3] It is unclear what the court meant by its "much lower burden" remark. We need not determine what burden of proof the court applied to the third prong of the beneficial relationship exception, however, because we conclude that the first prong is dispositive in this case.

with their current caretakers is more substantial." The court noted again that the parents' contact with the children had never progressed beyond monitored visits and telephone calls.

Thus, the court held that the parents had failed to meet their burden of showing termination of the parent–child relationship would be detrimental to the children and, therefore, that the exception did not apply. The court then found, by clear and convincing evidence, that the children were adoptable, and it would be in their best interest to terminate parental rights. The court terminated parental rights.

The parents filed timely notices of appeal.

## DISCUSSION

Both parents contend the court erred when it found the beneficial parent–child relationship exception to adoption did not apply.[4] As we explain, the court did not err when it terminated the parents' parental rights.

---

[4] It is unclear from her briefing whether Mother also attempts to challenge the court's denial of her section 388 petition. Certainly, as the Department notes, she has presented no cogent argument and cited no relevant authority to support such an argument. (See Cal. Rules of Court, rule 8.204(1)(C) [appellant's brief must contain legal arguments supported by citations to authorities and the record on the points made].) Nor does she dispute, in her reply brief, the Department's claim that the issue is forfeited. As such, to the extent that Mother intended to challenge the court's ruling on that point, we do not address it. (See *People v. Stanley* (1995) 10 Cal.4th 764, 793.)

### 1.    The issue is not forfeited.

At the section 366.26 hearing, Mother's attorney explicitly raised the beneficial relationship exception. Father's attorney did not. Instead, Father's counsel stated: "Father is objecting to termination of his rights today." The Department contends Father's appeal should be dismissed because he failed to ask the juvenile court to apply the beneficial parent–child relationship exception. (See, e.g., *In re E.A.* (2012) 209 Cal.App.4th 787, 790 ["General objections are insufficient to preserve issues for review. [Citation.] The objection must state the ground or grounds upon which the objection is based. [Citation.]"]; *In re Richard K.* (1994) 25 Cal.App.4th 580, 590 ["As a general rule, a party is precluded from urging on appeal any point not raised in the trial court."].) We disagree.

Here, Father explicitly objected to termination of his parental rights. The court was aware of the basis of Father's objection from Father's arguments at both the termination hearing and the section 388 hearing, during which counsel had argued that the Department's reports showed the children loved Father, they cared deeply for him, and their bond with him deepened as he showed them he was trying to be a better parent. Indeed, it was so apparent that the beneficial parent–child relationship exception was before the court that the children's attorney preemptively raised it.

Given that the court went on to address the exception at length and in detail, we see no prejudice to the court or any of the parties from counsel's failure to raise the exception explicitly, and as such, exercise our discretion to address the issue on the merits. (See, e.g., *In re Stuart S.* (2002) 104 Cal.App.4th 203, 206; *In re Karla C.* (2010) 186 Cal.App.4th 1236, 1266–1267.)

12

## 2. Termination of Parental Rights and the Parent–Child Benefit Exception

Once the juvenile court terminates a parent's reunification services, " 'the focus [of the proceedings] shifts to the needs of the child for permanency and stability.' " (*In re Celine R.* (2003) 31 Cal.4th 45, 52.) At that point, adoption becomes the preferred permanent plan for the child, and the court should order it "unless exceptional circumstances exist." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 51.)

Section 366.26 requires the juvenile court to terminate parental rights if it finds by clear and convincing evidence that the child is likely to be adopted. (§ 366.26, subd. (c)(1).) A parent may avoid termination of parental rights, however, if he can show certain circumstances exist that support an exception to adoption. (*In re Caden C.* (2021) 11 Cal.5th 614, 617 (*Caden C.*).)

One exception exists where there is a beneficial relationship between the parent and child. (*Caden C.*, *supra*, 11 Cal.5th at p. 617.) To establish the beneficial parent–child relationship exception, the parent must show, by a preponderance of the evidence, that: (1) he has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship" and (2) the court finds that the relationship provides a "compelling reason for determining that termination [of parental rights] would be detrimental to the child." (§ 366.26, subd. (c)(1)(B)(i).)

In *Caden C.*, the California Supreme Court clarified how this exception works: "The language of [the beneficial parent–child relationship] exception, along with its history and place in the larger dependency scheme, show that the exception applies in situations where a child cannot be in a parent's custody but

13

where severing the child's relationship with the parent, even when balanced against the benefits of a new adoptive home, would be harmful for the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 630.)

In determining if the beneficial parent–child relationship exception applies, "the court acts in the child's best interest in a specific way:  it decides whether the harm of severing the relationship outweighs 'the security and the sense of belonging a new family would confer.'  [Citation.]  'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[ ]' the child, the court should not terminate parental rights.  [Citation.] That subtle, case-specific inquiry is what the statute asks courts to perform:  does the benefit of placement in a new, adoptive home outweigh 'the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]'  [Citation.]  When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child due to' the child's beneficial relationship with a parent." (*Caden C.*, *supra*, 11 Cal.5th at pp. 633–634, italics omitted.)

The Supreme Court also clarified that a parent's failure to make adequate progress with his case plan or to address the issues that led to the child's dependency, while sometimes relevant to evaluating the quality of the parent–child relationship and weighing the consequences of severing that relationship against the benefits of a permanent adoptive home, is not a categorical bar to establishing the exception.  (*Caden C.*,

14

*supra*, 11 Cal.5th at pp. 637–638.) The critical question is whether the child's relationship with his parent is so significant that it outweighs the benefits of adoption, not whether the parent has satisfactorily addressed the issues that led to dependency proceedings. (*Id*. at pp. 635–636.)

Thus, to show the beneficial parent–child relationship exception applies, the parent bears the burden of establishing three elements: (1) regular visitation and contact with the child, taking into account the extent of visitation permitted; (2) the existence of a substantial, positive, emotional attachment between the child and the parent—the kind of attachment implying that the child would benefit from continuing the relationship; and (3) that terminating the parent–child relationship would be detrimental to the child even when balanced against the countervailing benefit of a new adoptive home. (*Caden C.*, *supra*, 11 Cal.5th at p. 636.) In evaluating whether the exception applies, courts should look to several factors, including the age of the child, the amount of time he spent in his parent's custody, the quality of interaction between parent and child, and the child's particular needs. (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.) If the parent establishes all three elements, the exception applies, and the court should select a permanent plan other than adoption. (*Caden C.*, at pp. 636–637.)

### 3. Standard of Review

Typically, the juvenile court's findings on the first two elements—regular visitation and whether the child would benefit from continuing the relationship—are reviewed for substantial evidence. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639–640.) Courts review the third element using a hybrid standard: reviewing

factual determinations for substantial evidence and the weighing of the relative harms and benefits of terminating parental rights for an abuse of discretion. (*Ibid*.)

But where, as in this case, the appellant contends that the court below erred in finding he did not meet his burden of proof,[5] we must determine whether the evidence compels a finding in favor of the appellant as a matter of law. (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved of on another ground in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.) "Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' [Citation.]" (*I.W.*, at p. 1528.)

4.    **The parents have not demonstrated regular visitation.**

In addressing the beneficial parent–child relationship exception to termination of parental rights, the court commented on the first prong—whether the parents maintained regular visitation and contact with the children: "The parents have had contact. Parents and counsel have indicated that the parents have visited as much as they can. That visitation has remained monitored throughout dependency of this case."

---

[5]    In *Caden C.*, unlike in this case, the juvenile court found the mother met her burden to establish the beneficial parent–child relationship exception, but the appellate court reversed the juvenile court's ruling. (*Caden C.*, *supra*, 11 Cal.5th at pp. 628–629.)

16

"Regular visitation exists where the parents visit consistently and to the extent permitted by court orders." (*In re I.R.* (2014) 226 Cal.App.4th 201, 212 (*I.R.*).) The record shows that Mother and Father did not visit regularly, according to this definition.

### 4.1. Mother's Visitation

At the detention hearing, the Orange County Juvenile Court ordered a minimum of six hours of monitored visits a week for Mother immediately and for Father when he was released from custody. In its Jurisdiction/Disposition Report, the Agency wrote that on October 15, 2019, the caregiver reported that Mother had alcohol on her breath during her October 10, 2019 visit. Mother's visits were put on hold until the accusation could be investigated.

When Los Angeles County received the case, the caregivers reported that since the detention hearing, Mother had visited two days a week, monitored by the maternal grandfather. Mother cancelled a few visits at the last minute, and the caregivers were concerned about Mother's alcohol use because she smelled of alcohol during the October 10, 2019 visit. The caretakers also reported the children were "whiny" and "defiant" after visits.

The Los Angeles County Juvenile Court ordered six hours per week of monitored visits: three times per week for two hours per visit. At the beginning of the first status review period, Mother was visiting twice a week, monitored by the caretakers. But by the time of the hearing, the caretakers no longer wanted to monitor Mother's visits because she tried to get the children to talk to Father on the telephone when they appeared uninterested in doing so, and because she smelled of alcohol during a visit.

17

The caretakers had also had to advise her not to raise her voice to the children.

Thus, beginning in February 2020, the maternal grandfather began monitoring Mother's visits. Angelina and Rafael reported they enjoyed going to restaurants with Mother and the maternal grandfather.

In July 2020, however, one of the caretakers reported that Angelina told him Mother had been drinking alcohol during visits. Mother denied the claim. The maternal grandfather said Mother was drinking alcohol often at that time and was not doing well in that regard, but he ensured she did not drink during visits. Nevertheless, the social worker informed the maternal grandfather he could no longer monitor Mother's visits because he had not reported that Mother had relapsed and was drinking daily while visiting the children. After the social worker cancelled an upcoming visit, Mother enrolled in an inpatient program.

For the next review hearing, the Department reported that Mother telephoned the children four times per week from her inpatient substance-abuse program. The children would also FaceTime Mother. But there was no report of any in-person visits, and Mother did not telephone the children at all during October 2020, when she had left the program and was living with the maternal grandfather.

Mother began visiting the children again in November 2020, after Father was released from prison. Yet although the court had allowed her three two-hour visits each week, she only visited twice per week and telephoned the children three times per week. And, when the social worker asked the caretakers about Mother's complaint that she was not informed of the

children's school progress, they said that for the first 10 months or so, when they contacted Mother about such issues she didn't respond. It was only after Father was released from prison that Mother started coming around and engaging with the children.

During the hearing on her section 388 petition, Mother testified she was only visiting once a week for 90 minutes. This was consistent with the section 366.26 report, which said Mother and Father were visiting the children on Thursdays for two to three hours, with Father visiting for the first half of the visit while Mother visited during the second half of the visit. Mother also telephoned the children three times a week, monitored by the caretakers.

Mother testified that she constantly asked for more visitation time. But she also acknowledged that her request had not been denied: The Department told her it did not have the resources to monitor more than the 90 minutes she visited each week. The social worker confirmed this account—and explained that Mother had never identified anyone else who could act as a monitor and, thereby, secure additional visitation time.

In sum, the record shows the juvenile court ordered six hours of weekly visitation time: three two-hour visits. Mother's continued alcohol abuse resulted in her losing two monitors—and her failure to name other possible monitors left her with a single 90-minute visit each week. This record supports the juvenile court's finding that Mother failed to prove the first prong of the beneficial parent–child relationship exception.

### 4.2. Father's Visitation

On September 26, 2019, the Orange County Juvenile Court ordered a minimum of six hours of monitored visits a week for Father when he was released from custody. On October 15, 2019,

the Agency reported that Father had not contacted the social worker to arrange for visits since his release from jail on October 3, 2019. At the section 388 petition hearing, Father testified that he was incarcerated when the case began. He was released ten days later and rearrested about a month after that. Therefore, Father failed to visit his children for a month between his two arrests.

At the disposition hearing, the Los Angeles Juvenile Court likewise ordered six hours of weekly visitation: monitored visits three times per week for two hours per visit. That order remained in effect throughout the case.

Father's second incarceration lasted 13 months. Initially, the caregivers monitored Father's phone calls with the children. When the caregivers told the Department they didn't want to continue monitoring the calls, the children began writing letters to and drawing pictures for Father. Therefore, during this time, Father was unable to visit and only spoke with the children by telephone when the maternal grandfather monitored his phone calls during Mother's visits. The children said they enjoyed their telephone calls and wanted to continue sending Father drawings. At some point after the first status review hearing, the caretakers started monitoring Father's phone calls with the children again. The children continued to enjoy speaking with Father on the phone. Father was released from prison on November 17, 2020.

For the March 23, 2021 review hearing, the Department reported that Father was visiting the children twice a week for 90 minutes and telephoning the children three days a week. The social worker saw Angelina and Rafael hug Father and appear comfortable and playful with him. Father ensured the children

20

were safe and brought them lunch and snacks. He appeared to bond well with the children and engaged them in conversation as he pushed them on the swings or played catch; the children followed Father's directions and interacted with him well. During visits at the library, the parents would bring dinner, play hide-and-seek, and help the children with homework. The children appeared to enjoy their visits and were talkative and energetic.

In sum, however, the record shows that Father had only one in-person visit for the first 14 months of the case and, when he was released from prison, instead of visiting for six hours each week—three two-hour visits—he visited for only 90 minutes. As with Mother, the Department asked Father to identify additional monitors so he could increase his visitation time, but Father failed to do so.

In short, Father, like Mother, has not established, as a matter of law, that he maintained sufficiently regular visitation and contact with the children to meet the first prong of the beneficial parent–child relationship exception. (*In re I.R., supra*, 226 Cal.App.4th at p. 212 [parents must demonstrate that they visited consistently, to the extent permitted by the juvenile court].) To be sure, parents do not need to visit on every possible occasion to make this showing. (*In re Jeremy S.* (2001) 89 Cal.App.4th 514, 522.) Here, however, although the parents sometimes visited consistently, and the children were happy to see them when they did, they used only a fraction of their allotted visitation time. They could not, or would not, provide additional monitors. Thus, due to the lack of sufficient regular visitation and contact, the court did not err when it terminated parental rights.

21

## DISPOSITION

The court's order terminating the parents' parental rights and setting adoption as the permanent plan is affirmed.

HARUTUNIAN, J.*

We Concur:

STRATTON, P. J.

WILEY, J.

---

*       Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.